Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| EL PUEBLO DE PUERTO RICO **Apelado** v. MÁXIMO HERRERA **Apelante** | KLAN202300492 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de **Bayamón** Caso Núm.: D VI2018G0067, D LA2018G0300, D LA2018G0301 Sobre: Art. 93 (a) del Código Penal de 2012, Art. 5.04 y Art. 5.15 de la Ley de Armas de 2000 |

Panel integrado por su presidente, el juez Bonilla Ortiz, la juez Barresi Ramos y el juez Pérez Ocasio.

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 14 de octubre de 2025.

Comparece ante nos, Máximo Herrera, en adelante, Herrera o apelante, solicitando que revoquemos la *"Sentencia"* impuesta en su contra, el 9 de agosto de 2019, por el Tribunal de Primera Instancia, Sala Superior de Bayamón, en adelante TPI-Bayamón. En la misma, el Foro Primario declaró culpable a Herrera por Asesinato en Primer Grado y dos (2) infracciones de la Ley de Armas de Puerto Rico.

A la luz del derecho aplicable, y por los fundamentos que expondremos a continuación, *confirmamos* la *Sentencia* apelada.

**I.**

Por hechos acontecidos el 13 de noviembre de 2018, se radicaron varias denuncias contra el apelante, el día 15 de noviembre de ese mismo año.[2] A Herrera se le imputó: (1) un cargo

---

[1] Véase Orden Administrativa OATA-2023-131 del 14 de julio de 2023, donde se designa al Juez Alberto Luis Pérez Ocasio en sustitución del Juez Ángel R. Pagán Ocasio.
[2] Los hechos esbozados en la primera parte de esta sentencia son extraídos de los autos originales los cuales recibimos el día 25 de marzo de 2025.

por el delito de Asesinato en Primer Grado,[3] (2) un cargo por portar, ilegalmente, un arma de fuego, y (3) un cargo por apuntar y disparar un arma de fuego.[4]

La vista al amparo de la Regla 6 de Procedimiento Criminal, 34 LPRA Ap. II, R.6, fue celebrada el 15 de noviembre de 2018. En la misma, se determinó Causa Probable para arresto. La Vista Preliminar al amparo de la Regla 23 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 23, fue señalada para el 29 de noviembre de 2018. Sin embargo, la misma fue celebrada el 6 de diciembre de 2018. Luego, el TPI-Bayamón emitió una *"Resolución"* en la cual encontró Causa Probable para acusar por los delitos antes mencionados.[5]

Posteriormente, el 20 de diciembre de 2018, se celebró la Lectura de Acusación conforme a las Reglas 52 a la 60 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 52-60, en la que el apelante quedó apercibido de los efectos de no comparecer y fue citado para juicio. Hasta ese momento el apelante estaba siendo representado por el Lcdo. José Valle Brenes.

Luego de realizado el descubrimiento de prueba y celebradas varias Vistas de Estado de los Procedimientos, el 4 de abril del 2019, el Lcdo. Valle Brenes solicitó el relevo como representación legal, debido a la pérdida de confianza en la relación abogado-cliente. En la Vista de Estado Procesal celebrada el 23 de abril de 2019, el Lcdo. Joshua Cruz Ramos asumió la representación legal del apelante y, en consecuencia, el Lcdo. Valle Brenes fue relevado de la misma.

El 7 de mayo de 2019, el apelante expresó su intención de ser juzgado por Tribunal de Derecho.[6] Luego de que el juez le advirtiera sobre los efectos de su decisión, el tribunal confirmó la renuncia a su derecho constitucional a juicio por jurado, y consignó que la

---

[3] Artículo 93(a) del Código Penal de Puerto Rico, Ley 146-2012, 33 LPRA sec. 5142.
[4] Artículos 5.04 y 5.15 de la Ley de Armas de Puerto Rico, Ley 404-2000, 25 LPRA ant. secs. 458c & 458n.
[5] Autos originales del caso, Tomo I.
[6] Transcripción de la prueba oral, pág. 2.

misma fue libre, voluntaria, inteligente y con pleno conocimiento de sus consecuencias.[7] Ese día, comenzó el desfile de prueba por parte del Ministerio Público, estando representado el acusado por el Lcdo. Joshua Cruz Ramos.

Finalmente, el juicio fue celebrado los días 7, 17 y 21 de mayo de 2019; 17, 21, 24 y 26 de junio de 2019; 2, 24, 25 y 29 de julio de 2019. A continuación, ofrecemos un resumen de los testimonios vertidos en el juicio que nos ocupa, y que hemos examinado con detenimiento:

**Shakira Alomar Marrero**

Shakira Alomar Marrero, de 21 años, es hija de la occisa Sandra Marrero Cañuelas, en adelante, Marrero Cañuelas. Declaró en Sala que conocía a Herrera hacía aproximadamente cuatro años, en virtud de la relación de noviazgo que este mantenía con Marrero Cañuelas. De igual forma, identificó a Herrera en Sala.[8] Describió dicha relación como una de naturaleza tóxica y señaló al apelante como una persona celosa, testificando sobre ciertos eventos como ejemplo para ello.[9]

Relató, asimismo, que aproximadamente un (1) mes antes del asesinato, sostuvo una conversación con Herrera en la residencia de Marrero Cañuelas, pues este insistía en hablar con ella.[10] En ese encuentro, le manifestó a Herrera que, si algo llegaba a sucederle a Marrero Cañuelas o a su hermano, él tendría "la mayoría de la culpa", ya que no había nadie que deseara causarles daño.[11]

Señaló que, aunque residía con su padre, acostumbraba a pasar los fines de semana con Marrero Cañuelas. Indicó también que, Herrera tenía llave de la residencia y semanas antes del asesinato, acompañó a la occisa Marrero Cañuelas a comprar un

---

[7] Transcripción de la prueba oral, págs. 4-5.
[8] *Íd.*, pág. 9-10.
[9] *Íd.*, pág. 11.
[10] *Íd.*, pág. 14-15.
[11] *Íd.,* pág. 15.

candado y cerraduras nuevas.[12] Relató, además, que el apelante solía presentarse en la residencia de Marrero Cañuelas sin previo aviso, ingresando a la marquesina, a la cocina y hasta al cuarto de Marrero Cañuelas sin autorización.[13]

Expresó que, cuando se enteró del fallecimiento de Marrero Cañuelas, al principio no lo creyó, pues no le pasó por la mente que esta hubiera muerto ni que alguien le hubiera quitado la vida.[14] Señaló que no fue hasta el 14 de noviembre de 2018, al presentarse en el Instituto de Ciencias Forenses, que le mostraron el cuerpo de Marrero Cañuelas para que lo identificara.[15]

Admitió que desde el año 2016 no vivía con Marrero Cañuelas, pero ocasionalmente se quedaba en la casa. Aunque no sabía todo lo que pasaba entre Herrera y Marrero Cañuelas, ella le contaba cuando se separaban.[16] Manifestó que entendía que no había otra persona que deseara hacerle daño a Marrero Cañuelas.[17]

El 21 de mayo de 2019, en el TPI-Bayamón, las partes estipularon la admisión de la siguiente prueba documental:

Exhibit 1: Informe médico forense preparado por la Dra. Irma Rivera Diez.

Exhibit 2: DVD con fotografías tomadas durante la autopsia por la Dra. Irma Rivera Diez.

Exhibit 3: DVD captado por los investigadores forenses en la escena, preparado por Sonia Acevedo Díaz.

Exhibit 4: DVD con fotografías tomadas por el investigador Pedro Castro del Instituto de Ciencias Forenses.

Exhibit 5: Informe de hallazgos de escena por la investigadora Gisel Rivera Cintrón, del Instituto de Ciencias Forenses.[18]

---

[12] Transcripción de la prueba oral, págs. 22-23.
[13] *Íd.,* págs. 24-26.
[14] *Íd.,* pág. 28.
[15] *Íd.,* pág. 29.
[16] *Íd.,* págs. 31-32.
[17] *Íd.,* pág. 36.
[18] *Íd.,* págs. 51-55.

**Agente Isander Rivera Ortiz**

El agente Isander Rivera Ortiz es investigador de la División de Homicidios de la Región de Bayamón. Con su testimonio se estipuló su capacidad como agente de la Policía de Puerto Rico. Señaló que el 13 de noviembre de 2018 comenzó su turno de servicio a las 8:00 a.m. y culminó a las 4:00 p.m. Indicó que, aproximadamente a la 1:20 p.m. de ese mismo día, mientras se encontraba trabajando junto a la agente Glenda Michelle Colón Rivera, recibió una llamada telefónica del sargento Baldwin Alvarado, quien le instruyó trasladarse a las Parcelas Sabana en Bayamón, ya que allí se había reportado un asesinato.[19]

Explicó que entre la 1:50 p.m. a 2:00 p.m. llegaron a la escena y ya se encontraban allí el sargento Baldwin Alvarado, varios policías municipales y un número considerable de personas. Añadió que, para eso de las 2:40 p.m., permanecía fuera de la escena, ubicado en el área de la acera frente a la residencia.[20]

Mientras estaba fuera de la escena, se acercó una señora que describió baja en estatura llamada Rita y le informó que llamó al 9-1-1. Le tomó los datos básicos para luego citarla pues Rita le dijo que, aproximadamente entre las 11:30 a.m. y las 12:00 p.m. del 13 de noviembre de 2018, se encontraba en su residencia junto a su esposo cuando escuchó unas detonaciones. Al asomarse por la ventana con su cónyuge, volvió a escuchar más disparos, por lo que se cubrió detrás de una columna de concreto. Acto seguido, observó que de la residencia de Marrero Cañuelas salió una persona calva, vestida con una camisa color gris y botas negras, quien brincó la verja de la casa y salió corriendo hacia la carretera. Indicó que, mientras se escondía nuevamente, escuchó otra detonación. Al mirar otra vez por la ventana, pudo ver a la misma persona subiendo

---

[19] Transcripción de la prueba oral, pág. 56.
[20] *Íd.,* pág. 57.

por la calle y mirando hacia las residencias, como si buscara algo. Indicó que, el individuo se le acercó y le solicitó que llamara al sistema de emergencias 9-1-1 porque habían matado a su amiga.[21]

Indicó que la persona observada por la testigo fue identificada como José Santana Ramos. Añadió que Rita le mostró el registro de la llamada efectuada al sistema de emergencias 9-1-1, la cual, según sus notas, se realizó a la 1:29 p.m. Asimismo, informó que Rita le mencionó que en la residencia donde ocurrieron los hechos había vivido anteriormente un guardia de seguridad, a quien había visto allí aproximadamente durante un año, y que este poseía una guagua color negra. Añadió que, conforme a la investigación, surgió que el guardia de seguridad al que Rita se refería era Herrera, a quien señaló en Sala.[22]

Relató que, aproximadamente dos o tres horas después, el sargento Baldwin lo instruyó a trasladarse al área de Cataño, pues unos agentes habían ocupado el vehículo de Herrera, el cual se encontraba estacionado en una calle dentro de una urbanización con control de acceso.[23] Señaló que la guagua encontrada coincidía con la descripción proporcionada por Rita.

El auto fue sellado, fotografiado y trasladado al área de la comandancia, donde fue entregado a la agente Glenda Michelle Colón Rivera.[24] Añade que no se halló ninguna arma de fuego en su interior.[25] Relata que la investigación del caso y la entrevista a Rita la continuó la agente Glenda Michelle Colón Rivera.[26]

**Elmer Torres Rosario**

Se estipuló que Elmer Torres Rosario fue la persona que transfirió la grabación de la llamada realizada al sistema 9-1-1 a un disco compacto (Exhibit 7) y que entregó el documento oficial

---

[21] Transcripción de la prueba oral, pág. 58.
[22] *Íd.,* pág. 59.
[23] *Íd.,* pág. 60.
[24] *Íd.,* pág. 61.
[25] *Íd.,* pág. 63.
[26] *Íd.*

relacionado con dicha llamada.[27] No obstante, Torres Rosario no testificó en el juicio. La llamada al 9-1-1 se escuchó en Sala.

### Rita Ramos Del Valle

Rita Ramos Del Valle, de 65 años, residente en la calle 7, parcela 277 de la comunidad Sabana Buena Vista en Bayamón, declaró conocer a la occisa Marrero Cañuelas por haber sido su vecina durante aproximadamente tres (3) años. Explicó que ambas residían a dos (2) casas de distancia.[28] Como parte de su testimonio, realizó un dibujo en la pizarra para ilustrar la ubicación de su residencia en relación con la de Marrero Cañuelas, así como las casas que quedaban entremedio.[29]

Relató que, desde hacía aproximadamente un (1) año antes de los hechos, Herrera visitaba con frecuencia a Marrero Cañuelas, a quien ella se refiere como el "esposo", pues era quien entraba y salía con ella de la residencia.[30] En Sala, Rita señaló e identificó a Herrera como la persona que acostumbraba ver saliendo de la casa de Marrero Cañuelas en las mañanas y llegando en horas de la tarde.[31] Añadió que, desde hacía unos dos (2) años, lo veía entrando y saliendo, vistiendo uniforme de guardia de seguridad y conduciendo un vehículo color negro.[32]

Señaló además que desde su residencia tenía visibilidad directa hacia la casa de Marrero Cañuelas y las demás viviendas de la zona.[33] Manifestó que la última vez que vio a Herrera fue el día de los hechos, el 13 de noviembre de 2018.[34] Ese día, se encontraba en su residencia junto a su esposo, Ángel del Valle Díaz.[35] Testificó que su esposo escuchó unas detonaciones y se dirigió al balcón, llamándola para que fuera a mirar. Ella le indicó que no lo haría y

---

[27] Transcripción de la prueba oral, págs. 78-79.
[28] *Íd.,* pág. 81.
[29] *Íd.,* pág. 82.
[30] *Íd.,* pág. 83.
[31] *Íd.,* pág. 84.
[32] *Íd.,* págs. 84-85.
[33] *Íd.,* pág. 85.
[34] *Íd.,* pág. 88.
[35] *Íd.*

le pidió que entrara, advirtiéndole que una bala podría alcanzarlo. No obstante, por la insistencia de su esposo, ella se asomó por la ventana. Luego se fue al balcón y se escondió detrás de su esposo.[36]

Mientras se encontraba escondida, observó a José Santana Ramos salir corriendo de la residencia de Marrero Cañuelas, brincar la verja y dirigirse hacia la izquierda.[37] No vio a ninguna otra persona en ese momento. Posteriormente, *vio a Herrera salir con una pistola disparando; este brincó la verja, falló en su primer intento, lo volvió a intentar y finalmente corrió detrás de Santana Ramos, realizando dos (2) disparos en total.*[38] Acto seguido, salió al patio, momento en que se acercó Santana Ramos, visiblemente nervioso, y le pidió que llamara al 9-1-1 porque habían disparado a su amiga dentro de la casa.[39]

La testigo llamó al 9-1-1 y explicó lo sucedido, sin tener conocimiento del nombre de Herrera, pues solo lo conocía de vista. Sobre su vestimenta, recordó que llevaba ropa oscura, mientras que Santana Ramos portaba botas altas y ropa de trabajo.[40]

No obstante, admitió que no presenció a ninguna persona entrar a la residencia de Marrero Cañuelas, ni dispararle ni asesinarla.[41] Confirmó que su casa se encontraba a dos (2) viviendas de distancia de la de Marrero Cañuelas y explicó que casi nunca interactuaba con Marrero Cañuelas, limitándose a conocerla como su vecina por la cercanía de su casa y porque la veía ocasionalmente.[42] Añadió que solo veía entrar y salir de la casa a Herrera, no veía a otras personas, ni siquiera a la hija de Marrero Cañuelas.[43]

---

[36] Transcripción de la prueba oral, pág. 89.
[37] *Íd.,* pág. 90.
[38] *Íd.,* pág. 90-91.
[39] *Íd.,* pág. 91.
[40] *Íd.,* pág. 92.
[41] *Íd.,* pág. 95.
[42] *Íd.,* pág. 95-96.
[43] *Íd.,* pág. 97-98.

Además, indicó que Santana Ramos también habló con el operador del 9-1-1, pero que no recordaba la dirección exacta debido a que estaba muy nervioso.[44] Santana Ramos le indicó qué decirle al operador del 9-1-1, *aunque ella pudo ver por sí misma parte de lo que estaba ocurriendo.*[45]

Declaró que, en la llamada al 9-1-1, manifestó no saber si Marrero Cañuelas estaba muerta, por lo que tampoco podía afirmar que la habían matado, ya que esa información se la proporcionó Santana Ramos.[46] De igual forma, cuando le indicó al operador del 9-1-1 que un individuo entró y le disparó, aclaró que no lo hizo porque lo hubiera visto, sino porque estaba repitiendo lo que Santana Ramos le había dicho.[47]

Conforme a la grabación de la llamada al 9-1-1, la testigo indicó que vio a un individuo disparando "a to' jender" mientras perseguía a otra persona.[48] Esta información no le fue comunicada por Santana Ramos, sino que fue algo que ella misma presenció.

Según relató, recuerda haber escuchado entre siete (7) y ocho (8) detonaciones.[49] Sostuvo que no había barrera que le impidiera observar lo que ocurría en la residencia de Marrero Cañuelas. En cuanto al arma, indicó que era de color oscuro.[50]

**Agente William Lugo Rodríguez**

Se estipuló la declaración del agente William Lugo Rodríguez a los efectos de constatar que labora en el Registro de Armas de Fuego del Cuartel General de la Policía y que participó en la emisión de la certificación que acredita que el apelante *no posee armas de fuego registradas.*[51] El documento fue marcado como Exhibit 10.[52]

---

[44] Transcripción de la prueba oral, pág. 116.
[45] *Íd.,* pág. 117.
[46] *Íd.,* pág. 120.
[47] *Íd.*
[48] *Íd.,* pág. 125.
[49] *Íd.,* pág. 132.
[50] *Íd.,* pág. 132.
[51] *Íd.,* pág. 141.
[52] *Íd.,* pág. 142.

**Ángel Del Valle Díaz**

Ángel Del Valle Díaz, de 73 años y esposo de Rita Ramos del Valle, declaró que se encontraba en la sala de su casa cuando escuchó unas detonaciones.[53] Conocía a Marrero Cañuelas de vista desde hacía aproximadamente dos (2) o tres (3) años. Al momento de rendir su testimonio, entendía que Marrero Cañuelas había fallecido.[54] Señaló que de las personas que solían frecuentar la residencia de Marrero Cañuelas, recordaba haber visto a un hombre a quien, en ese momento, no conocía por su nombre. No obstante, al verlo en Sala, *pudo identificar al acusado*, Herrera, como la persona que acostumbraba visitar la casa de Marrero Cañuelas.[55]

Expresó que la última vez que vio a Herrera fue el 13 de noviembre de 2018. Narró que ese día se encontraba almorzando junto a su esposa en la sala de su residencia cuando escuchó entre tres (3) y cuatro (4) detonaciones. Acto seguido, salió al balcón y se ocultó detrás de una columna.[56] Posteriormente, observó a José Santana Ramos acercarse a él para pedirle ayuda y solicitar que llamaran a la Policía. Indicó que, cuando llegaron los agentes, regresó a su residencia, mientras su esposa permaneció en el exterior ofreciendo información a la Policía.[57]

Además, el testigo manifestó que conocía a Marrero Cañuelas y a Herrera únicamente de vista y que no supo sus nombres hasta después de que ocurrieron los hechos.[58] Señaló que dos (2) semanas antes de los hechos del 13 de noviembre de 2018 dejó de ver a Herrera en la residencia de Marrero Cañuelas.[59]

---

[53] Transcripción de la prueba oral, pág. 142.
[54] *Íd.,* pág. 143.
[55] *Íd.,* pág. 144.
[56] *Íd.,* pág. 149.
[57] *Íd.,* pág. 152.
[58] *Íd.,* pág. 153-154.
[59] *Íd.,* pág. 156.

**Nerisa Babilonia Morales**

Nerisa Babilonia Morales es agente de la Policía de Puerto Rico desde hace ocho (8) años y se encuentra adscrita a la Unidad de Crímenes Cibernéticos desde 2013.[60] Señaló que el 29 de noviembre de 2018, la agente Glenda Colón Rivera acudió a su oficina acompañada de José Santana Ramos para obtener una comunicación de Facebook entre Santana Ramos y Herrera.[61] Explicó que se realizaron capturas de pantalla utilizando la herramienta *"sneaky cut",* las cuales fueron impresas, ponchadas y entregadas a la agente Colón.[62]

Se encontraba su firma en la parte posterior de cada papel que se le imprimió a Santana Ramos. Con su ponche y firma se estipuló y autenticó el documento.[63] Explicó que el protocolo no requiere que la persona querellante otorgue su consentimiento por escrito para que se pueda acceder a su cuenta.[64]

La Agente manifestó que realizó las gestiones en presencia de la agente Glenda Colón Rivera y del señor José Santana Ramos.[65] Explicó que fue Santana Ramos quien accedió a su cuenta de Facebook. Añadió que, al realizar dicha gestión, no tenía manera de corroborar si la cuenta pertenecía realmente a la persona en cuestión. Señaló, además, que al acceder a los mensajes y hacer las capturas, estos ya se encontraban en la cuenta y no tenía manera de identificar quién los había enviado.[66]

**Agente Luis Sánchez Méndez**

Luis Sánchez Méndez es agente de la Policía de Puerto Rico hace dieciséis (16) años.[67] Entre sus funciones se encuentra acudir al lugar de los hechos lo antes posible, preservar la escena y,

---

[60] Transcripción de la prueba oral pág. 180.
[61] *Íd.,* pág. 181-182.
[62] *Íd.,* pág. 182.
[63] *Íd.,* pág. 183.
[64] *Íd.,* pág. 185.
[65] *Íd.*
[66] *Íd.,* pág. 186.
[67] *Íd.,* pág. 186-187.

posteriormente, entrevistar a los testigos y demás personas relacionadas.[68]

El 13 de noviembre de 2018, Sánchez Méndez y su compañero, el agente Pedro Santiago Barreto, realizaban un patrullaje cuando escucharon por la radio, a través del sistema 9-1-1, que en la calle 7 de las Parcelas de Sabana, en la carretera 829, se había reportado una fémina herida de bala.[69]

Cuando llegó a la calle 7, observó que había varias personas en el lugar y se le acercó Santana Ramos, quien le señaló una residencia a mano izquierda donde se encontraba la dama herida de bala.[70] Narró que en el interior observó a Marrero Cañuelas herida, tendida en el suelo cerca de la puerta principal.[71] Marrero Cañuelas se encontraba boca abajo, ensangrentada – principalmente en su rostro – y no tenía signos vitales. En ese momento, testificó que no se podían apreciar las heridas de bala.[72]

El testigo entrevistó a Santana Ramos, quien le relató que se encontraba realizando un trabajo en la residencia de Marrero Cañuelas. Este último le manifestó que se sentó a la mesa del comedor cuando ella le sirvió comida y, de frente, había una pared con bloques de cristal a través de la cual observó la silueta de una persona intentando abrir la puerta.[73] Explicó que no se podía distinguir la persona, solo la silueta, *pero que sabía que se trataba de Herrera.* Indicó que salió hacia la marquesina para abrirle por allá y, tan pronto se abrió la puerta principal, comenzó a escuchar detonaciones, por lo que corrió a esconderse.[74] Añadió que, mientras permanecía escondido, observó a Herrera caminar en dirección

---

[68] Transcripción de la prueba oral, pág. 187.
[69] *Íd.,* pág. 188.
[70] *Íd.*
[71] *Íd.,* pág. 189.
[72] *Íd.*
[73] *Íd.,* pág. 190.
[74] *Íd.*

hacia donde él se encontraba. Sin embargo, relató que se mantuvo oculto y, eventualmente, Herrera se marchó del lugar.[75]

El Agente indicó que el 13 de noviembre de 2018 tomó notas de los testigos entrevistados, consignando lo que entendía era importante. Alegó que entregó dichas notas a la Fiscalía aproximadamente dos (2) semanas después de los hechos.[76] Sin embargo, no pudo reconocer sus notas dentro de los documentos que se encontraban en posesión de la defensa.[77]

Indicó que únicamente entrevistó a José Santana Ramos y a Rita, ya que los demás vecinos manifestaron que "no vieron nada".[78] Añadió que, según le relató Santana Ramos, este supo que se trataba de Herrera por un incidente previo que había ocurrido, además de que la silueta observada concordaba con su estatura y su complexión física.[79] Santana Ramos le narró que escuchó las detonaciones, pero no pudo ver quién las realizó.[80] Recuerda que entrevistó a Rita y lo que ella le manifestó, pero no recuerda si le tomó notas de esa entrevista.[81]

**José Santana Ramos**

José Santana Ramos, de 48 años, indicó que conoció a Marrero Cañuelas a través de actividades de "chinchorreo" que organizaba mediante su página de Facebook.[82] Específicamente, coincidieron en una actividad celebrada en abril del año 2018, en una playa en Dorado.[83] La primera vez que vio a Herrera fue en una actividad celebrada en los Baños de Coamo, para principios del año 2018.[84] Marrero Cañuelas le indicó que ella y Herrera mantenían una relación.[85]

---

[75] Transcripción de la prueba oral, pág. 191.
[76] *Íd.,* pág. 193-194.
[77] *Íd.,* pág. 195.
[78] *Íd.,* pág. 196.
[79] *Íd.,* pág. 200.
[80] *Íd.,* pág. 201.
[81] *Íd.,* pág. 202.
[82] *Íd.,* pág. 206-207.
[83] *Íd.,* pág. 207.
[84] *Íd.,* pág. 208.
[85] *Íd.*

Indicó que entre abril y mayo del año 2018 sostuvo la primera comunicación con Herrera a través de *Messenger*.[86] Relató que Marrero Cañuelas había publicado una foto en Facebook y él le comentó "la foto está bonita". A raíz de ese comentario, Herrera le escribió por *Messenger* para decirle que se alejara de Marrero Cañuelas porque ellos mantenían una relación.[87]

La amistad entre Santana Ramos y Marrero Cañuelas se fue desarrollando a través de mensajes de texto, llamadas telefónicas, *Messenger* y WhatsApp.[88] Indicó que se comunicaban a diario, pero que esta comunicación disminuyó cuando Herrera le informó que él y Marrero Cañuelas habían vuelto a estar juntos. Posteriormente, Marrero Cañuelas se acercó nuevamente a José Santana Ramos y le indicó que ya no mantenía una relación con Herrera, lo que permitió que retomaran la comunicación.[89]

Señaló que, a su juicio, la relación entre Marrero Cañuelas y Herrera era mala. Añadió, que Marrero Cañuelas le manifestó que le tenía temor a Herrera, que era agresivo, y le advirtió que tuviera cuidado si se lo encontraba en la calle, que guardara distancia y no le diera la espalda. También le expresó que temía por su vida.[90] Además, Marrero Cañuelas le comentó que tenía una orden de protección vencida y él le aconsejó que la renovara. Le pidió que no permitiera que Herrera entrara a su residencia. Pero a pesar de que ella decía que sí, el tema se quedaba ahí.[91] Expresó que podía interpretar los mensajes recibidos de parte del apelante como una amenaza.[92] Añadió que el 11 de noviembre de 2018 compartió nuevamente con Marrero Cañuelas en la sala de baile *El Romántico*.[93]

---

[86] Transcripción de la prueba oral, pág. 208.
[87] *Íd.,* pág. 209.
[88] *Íd.,* pág. 210.
[89] *Íd.*
[90] *Íd.,* pág. 211.
[91] *Íd.*
[92] *Íd.,* pág. 212.
[93] *Íd.,* pág. 212-213.

En Sala fue interrogado sobre la conversación sostenida entre Santana Ramos y el acusado a través de la red social Facebook, la cual fue marcada como Exhibit #11 de Ministerio Público.[94] Basado en los documentos presentados, relató que el 25 de mayo de 2018 añadió al apelante como contacto en Facebook. Posteriormente, el 28 de junio de 2018, el apelante le escribió: "sabe algo, buscaste conmigo, a mí no me vas a ver la cara", a lo que contestó: "Saludos, ¿de qué habla Max? ¿Qué te sucede Max?"[95] Más adelante, el 7 de septiembre de 2018, el apelante le envió otro mensaje que leía: "tú crees que ganaste, pero ganaste otra cosa". A dicho mensaje, respondió: "Buenos días, Max, ¿por qué dice eso?, ¿qué me gané Max? Lindo día".[96] El 25 de septiembre de 2018, el apelante le envió una foto de él junto a Marrero Cañuelas, acompañada del mensaje: "Mire mi hermano, hace dos semanas [Marrero Cañuelas] y yo estábamos de nuevo y usted sigue tirándole. Recójase y evite problemas." A lo que contestó: "Amén."[97]

El 8 de octubre de 2018, el apelante le envió tres (3) mensajes de "unos likes." El 29 de octubre de 2018, le envió "otro like." [98] El 12 de noviembre de 2018, un día antes de la muerte de Marrero Cañuelas, el apelante le escribió: "Ganaste, ¿pero sabes algo? De mí nadie se burla. Tengo mis cojones."[99] Posteriormente, realizó dos llamadas, una a las 4:01 p.m. y otra a las 4:02 p.m., las cuales no fueron contestadas.[100] En respuesta, él le escribió: "Dime Max, ¿qué sucede?" El apelante procedió a realizar otra llamada a las 4:08 p.m. y otra a las 4:47 p.m.[101]

Luego, Santana Ramos contestó por mensaje al apelante diciendo: "Te pregunto, si ella me pide ayuda en algo, ¿tengo que

---

[94] Transcripción de la prueba oral, pág. 214.
[95] Íd.
[96] Íd., pág. 215.
[97] Íd., pág. 215-216.
[98] Íd., pág. 217.
[99] Íd., pág. 218-219.
[100] Íd., pág. 219.
[101] Íd.

negarle la ayuda, Max? Ella me dijo que tiene que hacer unas cosas y que no sabe cómo." El apelante respondió: "¿Ayuda de qué?" A lo que él contestó: "Yo le dije a ella que lo que necesite, aquí estoy a sus órdenes." El apelante replicó: "Pues no." Y él le contestó: "Ahora te pregunto, ¿qué es?, ¿quién es el dueño de tu casa? No le tengo que negar la ayuda." A las 5:08 p.m. de ese mismo día, Herrera lo volvió a llamar, pero él no contestó.[102]

El testigo indicó que visitó a Marrero Cañuelas en su residencia por primera vez los días 7 y 8 de noviembre de 2019, con el propósito de realizar un trabajo de lavado a presión y raspado de pintura. Entiende que, para ese momento, Marrero Cañuelas ya se encontraba separada de Herrera. [103]

El 12 de noviembre de 2018, mientras conversaba por teléfono con Marrero Cañuelas, recibió varias llamadas de Herrera a través de *Messenger*, aproximadamente entre dos (2) y tres (3), las cuales no contestó. Le comentó a Marrero Cañuelas lo que estaba ocurriendo y, acto seguido, le indicó que permaneciera en línea para devolverle la llamada a Herrera y que así ella pudiera escuchar la conversación.[104] Durante la llamada, Herrera le preguntó si era él quien estaba realizando trabajos en la casa, a lo que respondió que sí.[105] Herrera le manifestó que no lo quería allí, que tenía un cuñado que podía encargarse de las labores. Él le contestó que había sido Marrero Cañuelas quien lo contrató para realizar el trabajo y que Herrera no era el propietario con autoridad sobre la residencia. Añadió que, si Herrera llegaba a la casa de Marrero Cañuelas, vería que él solo estaba realizando un trabajo y nada más. Herrera respondió: "ya veremos".[106]

---

[102] Transcripción de la prueba oral, pág. 220.
[103] *Íd.,* pág. 221.
[104] *Íd.,* pág. 225.
[105] *Íd.,* pág. 226.
[106] *Íd.*

Respecto a lo ocurrido 13 de noviembre de 2018, declaró que llegó a casa de Marrero Cañuelas a las 9:30 a.m., y comenzó a hacer el trabajo de lavado de presión.[107] Al mediodía, Marrero Cañuelas le preparó un sándwich y él se sentó a comer en el comedor mientras ella trabajaba en su computadora.[108] Señaló que, detrás de Marrero Cañuelas, había una pared de bloques de cristal que daba hacia el balcón.[109]

Detalló que la residencia tenía dos puertas: una que daba hacia el área del balcón y otra ubicada en la marquesina.[110] Relató que, mientras comía, vio a una persona que llegó al frente del balcón, a través de los bloques de cristal.[111] Manifestó que le dijo a Marrero Cañuelas: "hay una persona frente a la puerta". Ella se volteó, miró hacia el frente y expresó en ese momento: "ese tiene que ser Max".[112] En ese momento le dijo a Marrero Cañuelas que se mantuviera tranquila, que él iba a hablar con Max.[113]

Señaló que, mientras salía por la puerta de la marquesina, observó a Marrero Cañuelas frente a la puerta del balcón y, en ese momento, a través de los bloques de cristal, vio a una persona que se levantó la camisa y sacó un objeto.[114] Expresó que no sabe si Marrero Cañuelas estaba abriendo la puerta o aguantándola. Añadió que procedió a salir a la marquesina, abrió el portón y gritó con fuerza el nombre de "Max". Al mismo tiempo, escuchó el grito de Marrero Cañuelas seguido de dos (2) detonaciones.[115] Indicó que, en ese momento, corrió hacia el portón del frente, brincó la verja para buscar ayuda y pasó por el frente de la casa de Marrero Cañuelas.[116] Señaló que, aproximadamente entre treinta (30) a

---

[107] Transcripción de la prueba oral, pág. 227.
[108] *Íd.,* pág. 228-229.
[109] *Íd.,* pág. 229.
[110] *Íd.*
[111] *Íd.*
[112] *Íd.*
[113] *Íd.,* pág. 230.
[114] *Íd.,* pág. 230.
[115] *Íd.,* pág. 231.
[116] *Íd.*

cuarenta (40) segundos después, escuchó tres (3) detonaciones adicionales.[117] Relató que brincó hacia otro terreno y se escondió en la parte de atrás de la casa.[118] Al asomarse, para ver si Herrera lo había seguido, observó que estaba caminando por la acera o el lado de la carretera.[119] Describió que lo vio caminando ligero, vestido con unos mahones sueltos, a mitad de la rodilla, y una camisa.[120]

Expresó que, al perder contacto visual con el apelante, corrió y brincó nuevamente la verja hacia la residencia de Marrero Cañuelas. En ese momento, observó a Rita y le solicitó que llamara al 9-1-1, pues entendía que le habían disparado a su amiga Marrero Cañuelas.[121] Declaró que Rita procedió a llamar al 9-1-1 y le pasó la llamada. Sin embargo, como no sabía la dirección y se encontraba nervioso, le devolvió el teléfono a Rita, quien fue la que explicó la dirección al personal de emergencias. Añadió que, posteriormente, otra vecina entró a la residencia, salió llorando y dijo "está muerta, está muerta", refiriéndose a Marrero Cañuelas.[122] Minutos después de la llamada, llegó la Policía. Expresó que los agentes realizaron una investigación y le hicieron varias preguntas.[123]

Durante su testimonio, Santana Ramos declaró que es miembro de la página "cuarenta o más" de la red social Facebook, desde los años 2014-2015 y reconoció que para esa fecha él y el señor Herrera compartían aproximadamente cuarenta y cinco (45) amigos en común en la mencionada plataforma digital.[124] Afirmó que su relación con Marrero Cañuelas era solo de amistad, y enfatizó que no pretendía iniciar una relación sentimental con ella.[125]

En la declaración jurada, el testigo refirió que, tiempo atrás, le había enviado a Marrero Cañuelas un mensaje comentándole que

---

[117] Transcripción de la prueba oral, pág. 231.
[118] *Íd.,* pág. 232.
[119] *Íd.,* pág. 233.
[120] *Íd.,* pág. 234-235.
[121] *Íd.,* pág. 235.
[122] *Íd.*
[123] *Íd.,* pág. 236.
[124] *Íd.,* pág. 243-244.
[125] *Íd.,* pág. 246-249.

era "bonita". Posteriormente, Herrera habría leído dicho mensaje y se comunicó con él para advertirle que se alejara, alegando que ellos mantenían una relación sentimental.[126] El testigo indicó que mantenía comunicación diaria con Marrero Cañuelas mediante mensajes de texto, la cual disminuyó cuando Herrera le informó que estaban juntos. Asimismo, el testigo declaró que, según información proporcionada por Marrero Cañuelas, la relación entre ella y Herrera era conflictiva.[127] No obstante, Marrero Cañuelas no le informó que hubiera sido víctima de agresión física por parte de Herrera; únicamente manifestó que la amenazaba, sin mostrar evidencia de amenazas, golpes, moretones o indicios de peligro.[128]

Admitió que, si bien sintió temor por los mensajes enviados por el señor Herrera, nunca presentó querella ante la Policía ni solicitó una orden de protección.[129] Señaló que, durante el tiempo que conoció a Marrero Cañuelas, ésta terminó su relación con Herrera en varias ocasiones.[130] Expresó que nunca presenció a Herrera ocasionarle daño, amenazarla, apuntarle con un arma ni agredir físicamente a Marrero Cañuelas.[131]

Declaró que frente a la mesa donde se encontraba sentado había una pared con bloques ornamentales de cristal.[132] Señaló que, al momento de comerse su sándwich, no llevaba sus espejuelos y que la silueta que observó a través de los bloques de cristal no pudo identificarla con certeza, ni pudo determinar qué acción realizaba ni qué objeto tenía en sus manos.[133]

Indicó que fue entrevistado por varios agentes, aunque no recordó con precisión lo que les manifestó respecto a la identificación de la silueta observada ni sobre lo que Marrero

---

[126] Transcripción de la prueba oral pág. 251-252.
[127] *Íd.,* pág. 255.
[128] *Íd.,* pág. 256.
[129] *Íd.,* pág. 260.
[130] *Íd.,* pág. 263.
[131] *Íd.,* pág. 268.
[132] *Íd.,* pág. 277.
[133] *Íd.,* pág. 278.

Cañuelas le había señalado al respecto.[134] Reconoció, además, que cuando salió a la marquesina, Marrero Cañuelas gritó el nombre de Max, pero que no tenía manera de confirmar que la persona a quien Marrero Cañuelas llamó "Max" fuera realmente el apelante.[135]

**Agente Eliezer Lisboa Morales**

Se estipuló que el agente Eliezer Lisboa Morales, adscrito a la División de Crímenes Cibernéticos de la Policía, estaba debidamente capacitado para realizar la extracción de la información contenida en el teléfono celular ocupado en la escena, perteneciente a la occisa Marrero Cañuelas.[136] Añadió, además, que dicha extracción se efectuó a solicitud de la agente Glenda Colón Rivera.[137]

Surge de su testimonio que en este ejercicio logró extraer llamadas entre el apelante y Marrero Cañuelas, entre el 9 y 13 de noviembre de 2018 y dos (2) mensajes que envió Herrera a Marrero Cañuelas.[138] De estos mensajes surge que esta última le pedía que la dejara en paz y que su insistencia con ella la asustaba.[139]

No obstante, aclaró que, la extracción lógica que realizó no permite la recuperación de data borrada, lo cual pudiera incluir, llamadas, texto, multimedia, WhatsApp hechas y recibidas.[140]

**Dra. Irma Rivera Diez**

La Dra. Irma Rivera Diez es la patóloga forense que realizó la autopsia de Marrero Cañuelas en el Instituto de Ciencias Forenses (ICF).[141] Esta preparó el Informe médico-forense[142], el cual fue estipulado en el juicio.[143] Se concluyó que la occisa Sandra Marrero Cañuelas falleció a consecuencia de ocho (8) impactos de balas.

---

[134] Transcripción de la prueba oral, pág. 296-297.
[135] *Íd.,* pág. 298.
[136] *Íd.,* pág. 321.
[137] *Íd.,* pág. 322.
[138] *Íd.,* pág. 345.
[139] *Íd.,* pá. 356.
[140] *Íd.,* pág. 361.
[141] *Íd.* pág. 372.
[142] PAT-5253-18
[143] *Íd.*

### Agente Armando Santiago Ramos

El Agente Armando Santiago Ramos se encuentra adscrito a la División de Arrestos Especiales de la Policía de Puerto Rico.[144] Testificó que el día 13 de noviembre de 2018, el Teniente Alberto Rivera de la División de Inteligencia Criminal de Bayamón le solicitó que compareciera a la Urbanización Mansiones del Parque, en el Municipio de Cataño.[145] Allí efectuó el arresto de Herrera, dejándolo posteriormente en la custodia de los agentes de la División de Homicidios.[146]

### Agente Glenda Colón Rivera

La Agente Glenda Colón Rivera se desempeña en la División de Homicidio de Bayamón.[147] El 13 de noviembre de 2018, el sargento Alvin Alvarado le solicitó que se personara a la escena de los hechos del caso de autos.[148] Acudió junto al agente Isander Rivera.[149] Indico que estando allí, entrevistó a Santana Ramos.[150]

Según la Agente Colón Rivera, Santana Ramos le expresó que unos momentos antes de los hechos, se encontraba lavando la marquesina de Marrero Cañuelas, lo cual corroboró notando que la máquina de presión estaba aún encendida.[151] Además, testificó que Marrero Cañuelas logró ver a la persona que se proponía entrar a la casa en donde se encontraban, y lo identificó verbalmente como Max.[152] Indico que este, unos momentos después, escuchó las detonaciones.[153] Santana Ramos le expresó a la Agente Colón Rivera que vio a Max, vistiendo ropa oscura, corriendo y escondiéndose en un terreno.[154]

---

[144] Transcripción de la prueba oral, pág. 375.
[145] *Íd.*, pág. 376.
[146] *Íd.*
[147] *Íd.*, pág. 383.
[148] *Íd.*, pág. 387.
[149] *Íd.*
[150] *Íd.*, pág. 413
[151] *Íd.*, pág. 418.
[152] *Íd.*, pág. 414.
[153] *Íd.*, pág. 415.
[154] *Íd.*

Durante su testimonio, la Agente Colón Rivera corroboró varios asuntos del testimonio de Santana Ramos. Entre estos, corroboró la llamada al 9-1-1 hecha por la vecina, que accedió a los mensajes de *Messenger* entre Marrero Cañuelas y Herrera, y que el teléfono ocupado en la escena era, en efecto, el de la occisa, Marrero Cañuelas.[155]

Escuchada y aquilatada la prueba, el 29 de julio de 2019, TPI-Bayamón concluyó el juicio y encontró a Herrera culpable de Asesinato en Primer Grado, y por las infracciones imputadas a la Ley de Armas de Puerto Rico, *supra.* El 9 de agosto de 2019, se celebró la *"Vista de Lectura de Sentencia"*, condenando a Herrera a cumplir *ciento veintinueve (129) años de cárcel.*[156]

Así las cosas, el *13 de septiembre de 2019,* el Lcdo. Joshua Cruz Ramos presentó un recurso de apelación en el que solicitó a este Foro Apelativo la revocación de la sentencia dictada en su contra y la absolución del apelante respecto de todos los cargos por los cuales fue declarado culpable.[157] Sin embargo, el 18 de febrero de 2021, un panel hermano de este Tribunal desestimó el recurso por falta de jurisdicción, al haberse presentado el mismo fuera del término jurisdiccional de treinta (30) días dispuesto por Ley.[158]

Inconforme, Herrera recurrió ante nuestro Alto Foro. Así, el 14 de mayo de 2021, el Tribunal Supremo emitió una Resolución[159], notificada el 3 de junio de 2021, mediante la cual declaró *"No Ha Lugar"* la petición de Herrera.[160]

El 1 de marzo de 2022, Herrera presentó, a través de la División de Asuntos Especiales y Remedios Post-Sentencia de la Sociedad para la Asistencia Legal de Puerto Rico (SAL), una Moción al amparo de la Regla 192.1 de Procedimiento Criminal, supra,

---

[155] *Íd.*, pág. 419.
[156] Autos originales del caso, Tomo I.
[157] KLAN201901040.
[158] *Íd.*
[159] MO-2021-0004.
[160] Autos originales del caso, Tomo I.

solicitando ser re sentenciado, a fin de poder ejercer su derecho a apelar.[161]

El 16 de junio de 2022, el Lcdo. Joshua Cruz Ramos, quien representó al apelante durante el juicio, presentó una *"Urgente Moción Solicitando su Relevo como Representante Legal".*[162] Mediante orden emitida el 24 de junio de 2022 y notificada el 27 de junio de 2022, el TPI-Bayamón declaró *"Ha Lugar"* la solicitud de este, y lo relevó.[163]

El 1 de febrero de 2023, se celebró la Vista Argumentativa y se dio por sometida la petición de re-sentencia presentada por el apelante. El 4 de mayo de 2023, el Foro Apelado emitió una *Resolución* mediante la cual declaró *"Ha Lugar"* la moción al amparo de la Regla 192.1 de Procedimiento Criminal, *supra*, presentada por Herrera, ordenando así lo solicitado. Por ello, el *5 de junio de 2023*, el TPI-Bayamón dictó *nuevamente* sentencia contra este.[164]

El 6 de junio de 2023, Herrera, por derecho propio y en forma pauperis, radicó un recurso de apelación ante nos, en el cual solicitó que su recurso fuera referida a la División de Apelaciones de la Sociedad para Asistencia Legal, en adelante, SAL. El 10 de julio de 2023, la Sociedad para Asistencia Legal compareció ante esta Curia y solicitó la transcripción del juicio del caso de epígrafe. No fue hasta el *19 de agosto de 2024*, que recibimos la transcripción de la prueba oral.

Así las cosas, el 12 de febrero de 2025, emitimos una *"Resolución"* ordenando a la Secretaría del Foro Primario a proveer a las partes copia de la grabación de la llamada al 9-1-1 que formó parte del juicio celebrado el 21 de mayo de 2019. Además, el 13 de marzo de 2025, ordenamos al TPI-Bayamón elevar, en calidad de préstamo, los autos originales de los casos DVI2018G0067,

---

[161] Autos originales del caso, Tomo I.
[162] Autos originales del caso, Tomo II.
[163] *Íd.*
[164] Autos originales del caso, Tomo II.

DLA2018G0300 y DLA2018G0301. El 25 de marzo de 2025, recibimos los mismos.

En adición, el 23 de abril de 2025, a petición de SAL, solicitamos al Foro Apelado elevar, igualmente en calidad de préstamo, la evidencia que no obra en el expediente de este Tribunal, consistente con la prueba demostrativa de fotografías y videos, relacionada a los casos DVI2018G0067, DLA2018G0300 y DLA2018G0301. Recibida la prueba, el 16 de mayo de 2025, la representación legal del apelante pudo evaluar la misma.

Posteriormente, el *20 de junio de 2025*, se presentó el *"Alegato del Apelante"*. En el mismo, Herrera planteó los siguientes señalamientos de error:

> **ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CULPABLE AL APELANTE EN VIRTUD DE UNA PRUEBA QUE NO DERROTÓ SU PRESUNCIÓN DE INOCENCIA Y MUCHO MENOS ESTABLECIÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE.**

> **ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO TOMAR EN CONSIDERACIÓN QUE EL MINISTERIO PÚBLICO NO ENTREGÓ A LA DEFENSA PRUEBA, TAL COMO DECLARACIONES JURADAS, NOTAS DE ENTREVISTAS, VIOLENTANDO DE ESA MANERA EL DEBIDO PROCESO DE LEY AL QUE ES ACREEDOR EL SEÑOR MÁXIMO HERRERA, EL DERECHO A CONTRAINTERROGAR EFECTIVAMENTE A LOS TESTIGOS DE CARGO, PREPARAR ADECUADAMENTE SU DEFENSA Y A TENER UN JUICIO JUSTO E IMPARCIAL.**

> **SE VIOLENTÓ EL DEBIDO PROCESO DE LEY AL QUE ES ACREEDOR EL SEÑOR MÁXIMO HERRERA AL TOMAR EN CONSIDERACIÓN LA EXPRESIÓN REALIZADA POR LA OCCISA A PESAR DE QUE DICHA MANIFESTACIÓN ES CONSIDERADA PRUEBA DE REFERENCIA Y DICHA DETERMINACIÓN CONSTITUYE UN ERROR PERJUDICIAL. ESTO, PORQUE LA ADMISIÓN DE DICHA EXPRESIÓN TUVO UN EFECTO DECISIVO EN LA SENTENCIA CUYA REVISIÓN SE SOLICITA.**

Así las cosas, el *6 de agosto de 2025*, le concedimos al Ministerio Público, representado por el Procurador General de Puerto Rico, una prórroga de veinte (20) días para presentar su alegato en oposición al recurso. Finalmente, el *26 de agosto de 2025*, el Procurador General presentó el *"Alegato de El Pueblo de Puerto Rico"*.

Perfeccionado el recurso de autos, evaluados los escritos de ambas partes, así como la transcripción de la prueba oral, procedemos a resolver.

**II.**

**A. Apelación Criminal**

En nuestro ordenamiento jurídico, toda persona acusada tiene derecho a apelar cualquier sentencia penal que recaiga en su contra. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023). Es importante señalar que la apelación es un privilegio estatutario que adquirió un carácter cuasi-constitucional que forma parte del debido proceso de ley. *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022); *Pueblo v. Esquilín Díaz*, 146 DPR 808, 815-816 (1998); *Pueblo v. Prieto Maysonet*, 103 DPR 102, 104 (1974). Este Tribunal de Apelaciones, una vez adquirida la jurisdicción de la controversia, tiene el deber de resolver el recurso de apelación en sus méritos. *Pueblo v. Colón Canales*, 152 DPR 284, 291 (2000). Por ello, los tribunales apelativos poseemos la facultad de examinar cualquier error de derecho cometido por los tribunales de primera instancia, así como cualquier asunto de hecho y derecho. *Pueblo v. Rivera Ortiz*, supra, págs. 421-422; *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). Pues, como cuestión de derecho, la determinación de probar la culpabilidad de una persona más allá de duda razonable es revisable, dado que la apreciación de la prueba es un asunto tanto de hecho como de derecho. *Pueblo v. Torres Medina*, supra; *Pueblo*

*v. Irizarry*, supra; *Pueblo v. Rivero, Lugo y Almodóvar*, 121 DPR 454, 473 (1988); *Pueblo v. Pagán Díaz*, 111 DPR 608, 621 (1981).

Es norma hartamente conocida que el juzgador de los hechos está en mejor posición para apreciar y aquilatar la prueba presentada. *Pueblo v. Casillas, Torres*, 190 DPR 398, 416 (2014). A esos efectos, la apreciación de la prueba del juzgador de los hechos merece gran respeto y deferencia por parte de un foro apelativo. *Id.* Así las cosas, los tribunales apelativos solamente intervendremos con la apreciación de la prueba cuando se demuestre existencia de *pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Casillas, Torres,* pág. 417; *Pueblo v. Rivera Ortiz*, supra, pág. 422; *Pueblo v. Irizarry*, supra, págs. 788-789.

Además, intervendremos cuando surjan serias dudas, razonables y fundadas sobre la culpabilidad de la persona acusada. *Pueblo v. Casillas, Torres*, supra; *Pueblo v. Irizarry, supra,* pág. 789. Sin embargo, "si de un análisis ponderado de la prueba desfilada ante el foro primario surge duda razonable y fundada sobre si la culpabilidad del acusado fue establecida más allá de duda razonable, este Tribunal tiene el deber de dejar sin efecto el fallo o veredicto condenatorio". *Pueblo v. Casillas, Torres*, supra.

Cuando un acusado presenta un recurso de apelación en el que plantea como error insuficiencia de la prueba, así como errores de derecho, los foros apelativos realizaremos un escrutinio de dos (2) partes. *Pueblo v. Ortiz Colón*, 207 DPR 100, 125 (2021). En primer lugar, evaluaremos la alegación de insuficiencia de prueba que, de ser meritoria, procede absolver al acusado. *Id.* Ahora bien, si el reclamo de insuficiencia de la prueba resulta inmeritorio, procede atender los errores de derecho. *Id.*

### B. Duda Razonable

Nuestra Carta Magna, en su Artículo II, Sección 11, establece que los imputados o acusados de delito disfrutan de una presunción

de inocencia. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 907 (2024). Por eso, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, dispone que esta presunción de inocencia deberá ser rebatida, probando lo contrario. El estándar probatorio para que el Estado logre establecer la culpabilidad de un imputado o acusado de delito es la "duda razonable". *Pueblo v. García Colón I*, 182 DPR 129, 174 (2011); *Pueblo v. Ramos Álvarez*, 122 DPR 287, 315-316 (1988). Es decir, se deberá probar su culpabilidad más allá de toda duda razonable. Lo anterior, constituye uno de los imperativos más básicos y esenciales del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786. Cabe recalcar que este es el más riguroso estándar probatorio.

La duda razonable que justifica la absolución del acusado es "el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación." *Pueblo v. Irizarry*, supra, pág. 788. Es decir, la duda razonable no es otra cosa que "la insatisfacción de la conciencia del juzgador con la prueba presentada". *Id.*

### C. Prueba directa y circunstancial

Ahora bien, nuestro ordenamiento jurídico establece que un hecho puede establecerse mediante *evidencia directa* o *circunstancial.* Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110. La precitada Regla dispone, además, que la prueba directa es aquella "que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente". Por otro lado, la misma Regla establece que la *prueba circunstancial* "tiende a demostrar el hecho en controversia probando otro distinto, del cual por si o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia".

Con relación a la prueba testifical, tanto la precitada Regla, como nuestra jurisprudencia, ha sido clara en que aquel testimonio al que el juzgador le merezca entero crédito será suficiente para probar un hecho. *Id. Pueblo v. Chévere Heredia*, 130 DPR 1, 19-21 (1995). Es por esta deferencia a la credibilidad que otorgue el juzgador de los hechos a un testigo, que aun si se encontrara falsedad en parte sus declaraciones, no será necesario descartar el resto de su testimonio. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 260 (2011); *Pueblo v. Pagán Ortiz*, 130 DPR 470, 483 (1992).

Por otra parte, es norma reiterada que la apreciación que hace un juzgador de los hechos y de la prueba que desfila en el juicio es una cuestión mixta de hecho y de derecho. *Pueblo v. González Román*, 138 DPR 691, 708 (1995); *Pueblo en interés del menor F.S.C.,* 128 DPR 931, 942 (1991). Por esto, la misma es revisable en apelación. *Id.* Por otro lado, tal apreciación incide sobre la suficiencia de la prueba, capaz de derrotar la presunción de inocencia, lo que puede convertir este asunto en uno de derecho.

Nuestro Tribunal Supremo ha enfatizado, en ocasiones repetidas, que la valoración y el peso que el juzgador de los hechos le imparte a la prueba y a los testimonios presentados ante sí *merecen respeto y confiabilidad* por parte de este Tribunal. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991); *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 551 (1974). Como corolario de lo anterior, *salvo que se demuestre la presencia de error manifiesto, pasión, prejuicio o parcialidad*, el Foro Apelativo no debe intervenir con la evaluación de la prueba hecha por el juzgador de hechos. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 98-99 (2000); *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991).

No obstante, este Foro podrá intervenir con tal apreciación cuando de una evaluación minuciosa surjan "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v.*

*Carrasquillo Carrasquillo, supra*, pág. 551. Ante la inconformidad que crea la duda razonable, los tribunales apelativos, aunque no están en la misma posición de apreciar la credibilidad de los testigos, sí tienen, al igual que el Foro Apelado, "no sólo el derecho [,] sino el deber de tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry*, supra, pág. 790; *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 552.

Por ende, el Foro Primario está en mejor posición para aquilatar la prueba testifical que ante sí se presenta, ya que es quien tiene ante sí a los testigos cuando declaran. *Barreto Nieves et al v. East Coast,* 213 DPR 852, 889 (2024); *Pueblo v. Negrón Ramírez,* supra, pág. 910; *Pueblo v. González Rivera,* 207 DPR 846, 848 (2021); *E.L.A. v. P.M.C.,* 163 DPR 478, 490 (2004), *Argüello v. Argüello,* 155 DPR 62, 79 (2001). El juzgador de los hechos es quien goza del privilegio al poder apreciar el comportamiento del testigo, o el 'demeanor', lo que le permite determinar si le merece credibilidad o no. Este es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones, manerismos, dudas y vacilaciones. *Pueblo v. Cruz Rosario*, 204 DPR 1040, 1057-1058 (2020); *Pueblo v. Toro Martínez,* 200 DPR 834-857-858 (2018); *Pueblo v. García Colón I,* supra, pág. 165; *Pueblo v. Viruet Camacho,* 173 DPR 563, 584-585 (2008). Resulta importante destacar que "el testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio". *Pueblo v. Toro Martínez*, supra, pág. 860.

Por último, luego que recae un veredicto de culpabilidad, permea una presunción de corrección sobre el dictamen.

### D. Prueba de Referencia

La prueba de referencia constituye una declaración, oral o escrita, realizada fuera del juicio o vista que se ofrece como evidencia de la verdad de lo aseverado. Regla 801 de las Reglas de Evidencia,

32 LPRA Ap. VI, R. 801. Como norma general, nuestro ordenamiento jurídico excluye la admisión de este tipo de prueba. Regla 804 de Evidencia, supra. No obstante, las Reglas de Evidencia establecen una serie de excepciones mediante las cuales determinadas declaraciones extrajudiciales son admisibles, en tanto incorporan garantías circunstanciales de confiabilidad. *Pueblo v. Perez Santos*, 195 DPR 262, 275 (2016).

El fundamento de las reglas de exclusión a esta norma responde al fin primordial del derecho probatorio: la búsqueda de la verdad. E. L. Chiesa Aponte, *Reglas de Evidencia de Puerto Rico 2009: Análisis* por el Prof. Ernesto Chiesa, San Juan, Publicaciones JTS, pág. 250 (2009). En efecto, admitir declaraciones que carecen de tales garantías introduce riesgos de error que atentan contra la pureza del proceso judicial. Por ello, las excepciones previstas responden a la existencia de circunstancias objetivas que dotan de confiabilidad a la manifestación extrajudicial. *Pueblo v. Perez Santos*, supra.

En ese marco, la Regla 805 de Evidencia, *supra*, delimita las circunstancias en las cuales una declaración no estará sujeta a la regla general de exclusión. Esto último, independientemente de la disponibilidad del declarante. Su inciso (A) exceptúa las *manifestaciones contemporáneas a la percepción*, es decir, aquellas que narren, describan o expliquen un acto, condición o evento percibido mientras ocurría o inmediatamente después de acaecido. *Pueblo v. Perez Santos*, supra.

La confiabilidad de esta excepción descansa en el factor temporal, pues la inmediatez entre percepción y declaración imposibilita la falsedad deliberada. Véase E. L. Chiesa Aponte, *Reglas de Evidencia de Puerto Rico 2009: Análisis* por el Prof. Ernesto Chiesa, San Juan, Publicaciones JTS, pág. 254

(2009); *Práctica Forense Puertorriqueña: Evidencia,* T. II, págs. 585-586 (2002).

De igual forma, el inciso (B) contempla la excepción de la *"declaración espontánea por excitación",* definida como aquella realizada mientras el declarante se encuentra bajo el estrés provocado por la percepción de un acto, evento o condición, siempre que se refiera a este. *Pueblo v. Perez Santos,* supra, pág. 276. La garantía de confiabilidad que justifica esta excepción radica en que, bajo el efecto conmocionante del evento, las expresiones tienden a ser espontáneas e irreflexivas, resultando poco probable que sean producto de invención. *Íd.* Véase, *Informe de las Reglas de Evidencia,* Tribunal Supremo de Puerto Rico, pág. 513 (2007).

La jurisprudencia de nuestro Tribunal Supremo ha delineado tres requisitos para su admisibilidad: (1) que el evento sea lo suficientemente alarmante como para provocar una reacción espontánea; (2) que no medie un lapso que permita al declarante elaborar la manifestación; y (3) que la declaración se refiera al propio evento que la motivó. *Pueblo v. Cortés del Castillo,* 86 DPR 220, 229 (1962). En cuanto a la *espontaneidad,* hemos puntualizado que el hecho de que la manifestación sea respuesta a una pregunta no excluye per se su carácter irreflexivo. *Pueblo v. García Reyes,* 113 D.P.R. 843, 850 (1983).

### E. Efecto de las objeciones oportunas

La Regla 105 de las de Evidencia, supra, dispone sobre el efecto de los errores en la admisión o exclusión de prueba. La norma general establece que un error de esta índole no conllevará la revocación de la sentencia o decisión emitida, salvo que se cumplan dos requisitos esenciales: (1) ***que la parte adversamente afectada haya satisfecho los requisitos de objeción, fundamento u oferta de prueba, conforme lo exige la Regla 104***; y (2) que el foro revisor concluya que la evidencia admitida o excluida constituyó

un factor decisivo o sustancial en el resultado impugnado. *Íd.* Asimismo, cuando el error implique la violación de un derecho constitucional de la persona acusada, el Tribunal Apelativo sólo podrá confirmar la decisión si está convencido, más allá de duda razonable, de que el resultado hubiera sido el mismo aun sin la comisión del error. *Pueblo v. Santos Santos*, 185 DPR 709, 728-729 (2012).

En cuanto al primer requisito, la jurisprudencia ha reiterado la obligación de la parte objetante de dejar constancia suficiente en el récord de aquello que el testigo hubiera declarado, o de la prueba que se pretendía introducir, a fin de que el tribunal apelativo pueda evaluar el impacto de la exclusión o admisión errónea. *Pueblo v. López Rivera*, 102 DPR 359, 368 (1974). De ahí que la objeción oportuna y fundamentada sea un requisito indispensable para preservar el error en revisión. Véase E. L. Chiesa, *Práctica Procesal Puertorriqueña – Evidencia*, Publicaciones J.T.S., Inc., pág. 7, (1979).

Respecto al segundo requisito, nuestro más Alto Foro ha acogido la doctrina del error no perjudicial, o "harmless error" en inglés. Según ha expresado el Prof. Ernesto Chiesa, "el error en la admisión o exclusión de evidencia no acarrea revocación a menos que, mediando oportuna y correcta objeción, el tribunal apelativo estime que el error cometido fue factor decisivo o sustancial en la sentencia o decisión objeto de revisión". E. L. Chiesa, op cit. pág. 8. Véase, además, *Pueblo v Santiago Irizarry,* 198 DPR 35 (2017); *Pueblo v. Santos Santos*, supra; *Pueblo v. Martínez Solí*s, 128 DPR 135, 162 (1991); *Pueblo v. Ruiz Bosch,* 127 DPR 762, 786-87 (1991). De manera que el análisis pertinente no descansa en la mera identificación del error, sino en determinar si este tuvo la capacidad de alterar el resultado final. *Pueblo v Santiago Irizarry,* supra; *Pueblo v. Mangual Hernández*, 111 DPR 136, 145 (1981).

De no objetarse oportunamente la admisión o exclusión de la prueba, se entiende que la parte renunció a su planteamiento y no podrá presentarlo en revisión. Como norma general, el apelante no puede levantar en apelación asuntos no planteados ante el Tribunal de Primera Instancia. *Pueblo v. Rivero, Lugo y Almodóva*r, *supra,* pág. 476. En consecuencia, la doctrina del error perjudicial exige que el apelante demuestre que el resultado probablemente hubiera sido distinto de no haberse cometido el error. *Pueblo v Santiago Irizarry,* 198 DPR 35 (2017). Véase, además, E. L. Chiesa, op cit. pág. 8, (1979).

En síntesis, para que este Tribunal pueda acoger un señalamiento de error bajo la Regla 105 de Evidencia, supra, no basta con la identificación de la admisión o exclusión indebida; ***debe concurrir una objeción oportuna y fundamentada, así como la demostración de que el error constituyó un factor sustancial o decisivo en el resultado.*** Ello responde a la máxima de que el debido proceso de ley no garantiza un juicio perfecto, sino un juicio justo. *Pueblo v. Echevarría Rodríguez I,* 128 DPR 299, 381 (1991).

**III.**

Herrera comparece ante este Tribunal impugnando la "*Sentencia*" dictada en su contra el 9 de agosto de 2019 por el TPI-Bayamón. Conforme a nuestro ordenamiento jurídico, todo acusado ostenta el derecho a impugnar mediante apelación la sentencia penal recaída en su contra. En el ejercicio de nuestra función revisora, corresponde a este Tribunal aquilatar los señalamientos de error formulados por el apelante, lo que exige examinar la suficiencia de la prueba desfilada ante el Foro Primario, así como los errores de derecho imputados, a fin de determinar si la convicción dictada puede sostenerse en estricto derecho.

En su recurso, el apelante aduce tres (3) señalamientos de error. *Primero,* sostiene que el Ministerio Público no presentó prueba

suficiente que permitiera acreditar, más allá de duda razonable, su participación en los delitos imputados. Argumenta que la investigación realizada fue deficiente y que los testimonios recibidos resultaron contradictorios, por lo que, a su entender, no se logró rebatir la presunción de inocencia que le cobija constitucionalmente. *No le asiste la razón.*

La evaluación ponderada y minuciosa de los testimonios recibidos en el juicio persuade a este Foro que el Ministerio Público logró rebatir la presunción de inocencia que amparaba al apelante, estableciendo su culpabilidad más allá de toda duda razonable. A la luz de la totalidad de la prueba, se acreditaron los elementos del delito imputado, así como la vinculación del apelante con los hechos que dieron lugar al fallecimiento de Marrero Cañuelas.

De los testimonios vertidos por los testigos José Santana Ramos y Rita Ramos Del Valle se desprende un cuadro probatorio coherente que ubica al apelante Herrera en la escena del crimen, específicamente en los predios de la residencia de Marrero Cañuelas, el 13 de noviembre de 2018.

Del testimonio de Santana Ramos se evidencia que el apelante, Herrera, manifestó de manera consistente su intención de impedir cualquier cercanía entre Santana Ramos y Marrero Cañuelas, así como de obstaculizar la presencia de este en la residencia de Marrero Cañuelas. Tal patrón se refleja en los mensajes intercambiados entre el apelante y Santana Ramos, donde el apelante advertía expresiones tales como: "sabe algo, buscaste algo conmigo, a mí no me vas a ver la cara"[165] y "ganaste, ¿pero sabes qué?, de mi nadie se burla. Tengo mis cojones".[166]

De estas comunicaciones, previas a los hechos, se infiere que el apelante tenía conocimiento de que Santana Ramos estaría en la

---

[165] Transcripción de prueba oral, pág. 214.
[166] *Íd.,* pág. 220.

residencia el día de los hechos, lo que se corroboró con la llamada del día anterior, en la que Santana Ramos le informó que realizaría trabajos en la casa de Marrero Cañuelas por solicitud de esta, y que si se presentaba lo corroboraría, recibiendo como respuesta del apelante: "ya veremos".[167] Este conjunto de evidencia permite concluir que el apelante actuó con conocimiento de la presencia de terceros en la escena y con disposición a confrontar o interferir con la interacción entre Marrero Cañuelas y Santana Ramos.

De la prueba testifical se desprende que, en la fecha de los hechos, el testigo Santana Ramos observó una silueta masculina aproximarse a la residencia de Marrero Cañuelas y forzar la puerta de acceso.[168] Posteriormente, se produjeron detonaciones y se escuchó un grito proveniente de Marrero Cañuelas. Ángel Del Valle Díaz y Rita Ramos Del Valle, vecinos de Marrero Cañuelas, testificaron haber escuchado las detonaciones. El examen forense realizado por la Dra. Irma Rivera Diez estableció que la occisa Marrero Cañuelas sufrió ocho (8) heridas de bala, las cuales resultaron letales, concluyéndose así que la causa de manera de muerte fue homicidio. En adición, se desprende del *Informe de Hallazgos de Escena* preparado por el ICF, que se efectuó la recuperación de cinco (5) proyectiles o fragmentos de bala disparados y una (1) bala calibre .38mm sin disparar.

Si bien parte de la prueba presentada es de naturaleza circunstancial, la misma permite inferir razonablemente el elemento subjetivo requerido para la configuración del delito de asesinato en primer grado. El apelante no ofreció explicación ni presentó coartada alguna que evidenciara que no se encontraba en la escena de los hechos, ni se presentó evidencia alguna que menoscabara la credibilidad de los testigos. A la luz de lo anterior, este Tribunal

---

[167] Transcripción de prueba oral, pág. 226.
[168] *Íd.,* pág. 278.

concluye que la evidencia desfilada resulta suficiente en derecho para rebatir la presunción de inocencia y acreditar, más allá de duda razonable, la responsabilidad penal del apelante en la comisión del asesinato imputado.

En cuanto al *segundo* planteamiento de error, el apelante sostiene que se vulneró su derecho constitucional al debido proceso de ley al no habérsele entregado las declaraciones juradas de los testigos Rita Ramos Del Valle y Ángel Del Valle Díaz y las notas completas de la agente investigadora Glenda Colón Rivera. Dicho planteamiento, sin embargo, carece de mérito. *No le asiste la razón.*

De la prueba oral desfilada surge que, al culminar el interrogatorio directo de la testigo Rita Ramos Del Valle, la fiscalía consignó expresamente: "No hay declaración jurada, juez."[169] Más adelante, en el interrogatorio directo de la agente investigadora Glenda Colón Rivera, se planteó el asunto relativo a las alegadas declaraciones juradas de Rita Ramos Del Valle y Ángel Del Valle Díaz. Ciertamente, en su contrainterrogatorio, la agente Colón Rivera manifestó que Rita Ramos Del Valle había rendido una declaración jurada. Sin embargo, en el redirecto la testigo Colón Rivera aclaró que no recordaba con certeza haber tomado tal declaración ni podía precisar una fecha al respecto.[170] De igual manera, en cuanto a Ángel Del Valle Díaz, la agente Colón Rivera declaró que tampoco recordaba si se le había tomado o no una declaración jurada.[171] Incluso, en el recontrainterrogatorio, la agente Colón Rivera reiteró no tener memoria sobre ese particular, y explicó que, de haber manifestado lo contrario en el contrainterrogatorio, ello pudo haber sido una equivocación. [172]

Esta inconsistencia en el testimonio de la agente Colón Rivera no constituye, por sí sola, evidencia suficiente de una violación al

---

[169] Transcripción de prueba oral, pág. 93.
[170] *Íd.*, pág. 567.
[171] *Íd.*, pág. 570.
[172] *Íd.*, pág. 590.

debido proceso de ley atribuible al Ministerio Público, sino un asunto de credibilidad cuya valoración correspondía, en primera instancia, al tribunal sentenciador. El Foro Primario, por su contacto directo con la prueba, se encuentra en mejor posición para aquilatar la veracidad y confiabilidad de los testigos, por lo que resulta forzoso otorgar deferencia a su apreciación.

En cuanto a las alegadas notas de investigación, el Ministerio Público sostuvo haber entregado en su totalidad aquellas que obraban en su poder como parte del descubrimiento de prueba. Durante el interrogatorio directo de la agente Colón Rivera, la fiscal Patiño le cuestionó específicamente: "Usted dice que toma notas de todo. ¿Dónde están las notas de la entrevista de Rita?". [173] A lo que la testigo contestó categóricamente que no tomó notas.[174] Posteriormente, la agente Colón Rivera manifestó no estar segura de haber tomado notas adicionales en la referida entrevista y, de haberlo hecho, las mismas serían mínimas.[175] Así las cosas, del testimonio de la propia agente investigadora Colón Rivera se desprende que tales notas no existieron o, en su defecto, no revestían materialidad alguna. Por tal razón, no hay evidencia que permita concluir que el Ministerio Público retuvo u ocultó prueba favorable al apelante en contravención a su derecho constitucional de preparar una defensa adecuada.

En síntesis, la prueba depositada en el expediente demuestra que no existían declaraciones juradas de Rita Ramos Del Valle ni de Ángel Del Valle Díaz, y que la agente investigadora, Glenda Colón Rivera, no tomó notas adicionales que pudieran formar parte del descubrimiento de prueba. No puede atribuírsele al Ministerio Público la omisión de entregar evidencia inexistente. Las eventuales inconsistencias en el testimonio de la agente Colón Rivera

---

[173] Transcripción de prueba oral, pág. 569.
[174] *Íd.*
[175] *Íd.*

constituyen cuestiones de credibilidad cuya ponderación correspondía al Foro Apelado, a quien nuestro ordenamiento jurídico nos instruye otorgar deferencia. En consecuencia, no se configuró violación al debido proceso de ley, ni se menoscabó el derecho del apelante a contrainterrogar, preparar su defensa o recibir un juicio justo e imparcial, de modo que el TPI-Bayamón actuó conforme a derecho y no incurrió en error.

Como *tercer y último* señalamiento de error, el apelante sostiene que el Foro Primario erró al admitir como prueba la manifestación de la occisa, Marrero Cañuelas, quien expresó a José Santana Ramos la frase: "ese tiene que ser Max", al observar la silueta de un hombre tras la pared de bloques de cristal ubicada junto a la puerta principal de la residencia, en donde ocurrieron los hechos.[176] Alega el apelante que tal manifestación constituía prueba de referencia y que su admisión configuró un error de naturaleza constitucional que viciaba la validez del fallo condenatorio. *No le asiste la razón.*

De entrada, procede recordar que la Regla 801 de Evidencia, supra, define la prueba de referencia como una declaración hecha fuera del juicio y presentada para probar la verdad de lo aseverado, la cual, como norma general, no es admisible. Sin embargo, la Regla 805(A) de Evidencia, supra, dispone como excepción la *declaración contemporánea a la percepción*, esto es, aquella narración hecha en el mismo momento en que la persona declarante percibe el acto, condición o evento. Tal es precisamente la situación de autos: Marrero Cañuelas, en el instante en que percibe la silueta tras la pared de bloques de cristal, reconoce de manera inmediata a su expareja y lo manifiesta verbalmente. El elemento de contemporaneidad y espontaneidad dota a dicha declaración de la garantía de confiabilidad exigida por nuestro ordenamiento.

---

[176] Transcripción de prueba oral, pág. 229.

A juicio de este Tribunal, no cabe duda de que Marrero Cañuelas, en su carácter de dueña de la residencia y persona que convivió con el señor Herrera durante un período aproximado de dos (2) años en dicha propiedad, contaba con el conocimiento necesario para identificarlo aun en circunstancias de visibilidad limitada. Resulta jurídicamente razonable concluir que la familiaridad adquirida tras una prolongada convivencia le permitió reconocer con un alto grado de certeza la complexión física, la estatura, la postura corporal y demás características particulares del señor Herrera.

En ese sentido, el que la percepción haya ocurrido a través de una pared de bloques de cristal no elimina la fiabilidad del reconocimiento, máxime cuando lo relevante no es la nitidez de la imagen percibida, sino la capacidad de la testigo para inferir razonablemente la identidad de la persona a partir de rasgos distintivos conocidos. El Tribunal Supremo de Puerto Rico ha reconocido que la valoración de la credibilidad y confiabilidad de las identificaciones debe atenderse caso a caso, tomando en cuenta la cercanía de la relación entre quien observa y la persona observada, así como la oportunidad de conocimiento previo. En el presente caso, esas circunstancias fortalecen la credibilidad del reconocimiento efectuado por Marrero Cañuelas, el cual no puede considerarse producto de mera conjetura, sino de una apreciación fundada en experiencia directa y prolongada con el señor Herrera.

Aun si asumiéramos que la admisión de la declaración resultara errónea, ello no conllevaría la revocación de la sentencia. En primer término, resulta menester destacar que la defensa no formuló objeción oportuna al testimonio de Santana Ramos en cuanto a lo que la occisa, Marrero Cañuelas, le manifestó. De la transcripción de la prueba testifical se desprende que la defensa guardó silencio tanto en el interrogatorio directo de Santana

Ramos,[177] donde se introdujo la referida manifestación, como en el testimonio de Glenda Colón Rivera[178], quien también hizo referencia a la misma. Tal omisión procesal resulta significativa, pues conforme a nuestro estado de derecho, la falta de objeción impide a la parte apelante cuestionar válidamente en la etapa apelativa la admisibilidad de dicha prueba, salvo que se trate de un error craso que afecte sustancialmente derechos constitucionales del acusado.

Conforme a la Regla 105 de Evidencia, supra, la doctrina del error perjudicial exige concluir que el error en la admisión o exclusión de prueba fue un factor sustancial o decisivo en el resultado alcanzado. *Pueblo v. Mangual Hernández*, 111 DPR 136, 145 (1981). En el presente caso, la prueba circunstancial desfilada —a saber, los testimonios coherentes de José Santana Ramos y Rita Ramos Del Valle que ubican al apelante en la escena del crimen, la evidencia pericial sobre la trayectoria de los disparos y la ausencia de una coartada del apelante— bastaba para acreditar la culpabilidad más allá de duda razonable, independientemente de la referida manifestación de Marrero Cañuelas.

En consecuencia, este Tribunal concluye que la declaración objeto de controversia era admisible conforme a la excepción dispuesta en la Regla 805(A) de Evidencia, supra. Aun si se entendiera que su admisión resultó errónea, lo cierto es que dicho señalamiento no podía ser traído válidamente en esta etapa apelativa, toda vez que la defensa no formuló objeción alguna en el TPI-Bayamón, respecto al testimonio de José Santana Ramos ni al de Glenda Colón Rivera. Aun si este Tribunal concluyera que el planteamiento goza de alguna credibilidad, lo cierto es que la admisión de la declaración no constituyó un error de tal magnitud que afectara sustancialmente el resultado del juicio, máxime cuando

---

[177] Transcripción de prueba oral, pág. 229.
[178] *Íd.*, pág. 414-415.

la prueba circunstancial y pericial desfilada acreditó con suficiencia la culpabilidad del apelante.

**IV.**

Conforme a los hechos y derecho consignados, **confirmamos** la *"Sentencia"* apelada, emitida y dictada el 9 de agosto de 2019, por el Tribunal de Primera Instancia, Sala Superior de Bayamón.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


                          LCDA. LILIA M. OQUENDO SOLÍS
                          Secretaria del Tribunal de Apelaciones